# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHAWEZI MWANTEMBE**, *et al.* | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **TD BANK, N.A.**, *et al.* | : | **NO. 09-0135** |
| | : | |

## MEMORANDUM OPINION

Savage, J.                                                                                          November 17, 2009

### Introduction

This putative consumer class action asserting causes of action under Pennsylvania law for the defendant banks' failure to disclose the deduction of dormancy and replacement fees[1] from gift cards prior to their expiration dates raises a question of the preemptive effect of the National Bank Act. Moving to dismiss the amended complaint, the defendants, nationally chartered banks, argue that the state law claims are preempted by the National Bank Act ("NBA") and the regulations issued by the Office of the Comptroller of the Currency ("OCC"). There is no dispute that gift cards issued by national banks are federally regulated. The question is whether state law imposing disclosure and marketing requirements for gift cards prevents or significantly interferes with the national banks' activity or the federal regulator's exercise of its powers.

Because enforcing state consumer protection laws regarding the disclosures does not conflict with federal law governing gift cards and will not unduly impair the defendants banks' ability to engage in the business of selling gift cards, we hold that the plaintiffs' state law claims are not preempted.

---

[1] Dormancy fees are charges deducted from a card after a period of inactivity, which reduces the value of the card.

**Factual Allegations**

The plaintiffs, on behalf of Pennsylvania residents who held or hold gift cards sold by the defendants,[2] assert causes of action under Pennsylvania law for violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-2(3), 201-2(4)(xxi), 201-3, breach of contract and third party beneficiary.[3] They allege that the defendants' deducting undisclosed dormancy and other fees that diminish the value of the gift cards before their expiration is "deceptive, unlawful, and misleading," and is calculated to "trick, mislead, and significantly confuse consumers in Pennsylvania into not retaining or claiming the full value and buying power" of the cards.[4]

The plaintiffs allege that the defendant banks marketed and sold the gift cards without adequately disclosing the cards' material terms and conditions to purchasers and recipients. They also claim that prior to purchase, the defendants' representatives never discussed or otherwise disclosed to purchasers the imposition of dormancy and

---

[2] The plaintiffs voluntarily dismissed defendants Toronto-Dominion Bank and its predecessor in interest, Commerce Bancorp, Inc. The remaining defendants are TD Bank, N.A. and Commerce Bank, N.A.

[3] The amended complaint included causes of action for civil conspiracy and unjust enrichment. At oral argument, the plaintiffs withdrew the civil conspiracy count. *See* Transcript of Oral Argument, July 22, 2009 ("Tr.") at 39; Pls.' Supp'l Mem. of Law (filed July 21, 2009) at 3 (Doc. No. 22). Later, they also withdrew the unjust enrichment count. Pls.' Supp'l Mem. of Law (filed Aug. 4, 2009) at 1 n. 1 (Doc. No. 25). The plaintiffs also alleged that the banks retain the unclaimed funds to avoid Pennsylvania's escheat law. Am. Compl. ¶¶ 4, 5xiv, 35xiv. Plaintiffs have withdrawn all claims alleging avoidance or violation of the escheat law. Pls.' Mem. of Law (filed July 27, 2009) at 2 (Doc. No. 24).

[4] Am. Compl. ¶¶ 3-4, 75; 73 P.S. § 201-2(4)(xxi). As alleged in the amended complaint, gift cards are a $300 billion annual business. *E-Commerce Times* estimates that 10% of the value on the gift cards issued will not be used, yielding a windfall profit to the issuers. This is akin to a consumer paying for an item at a store and leaving without it. Although some retailers that issue their own gift cards claim that they prefer card holders to use their cards in order to bring the card holders into the store, banks only stand to benefit when holders of bank-issued cards fail to spend some or all of the value of the card. *See* Am. Compl. ¶¶ 30, 32; John P. Mello, Jr., *Unused Gift Cards Give Retailers $8 Billion Boon*, E-Commerce Times, Dec. 19, 2006, http://www.ecommercetimes.com/story/54792.html.

replacement fees, or issue dates and expiration dates.[5]

According to the amended complaint, the gift card at issue is a credit-card sized plastic card with a magnetic stripe on the back. On the front, there appears a "Good Thru" date, in raised, large letters, and the value amount, which is the card's value at the time of purchase. There is no issue date anywhere on the card. In very small print on the back of the card, it states, "Cardholder by using or permitting use of this Gift Card, you agree to the terms and conditions that accompanied the Card." The gift card comes in a prepackaged decorative box which is tied shut. Inside the box, in a hidden pouch within a cardboard folding envelope, a piece of paper containing terms and conditions may be found. Nowhere on the box or on the cardboard folding envelope is there notice of the material terms and conditions related to the card, or notice of the existence of the hidden pouch where the terms and conditions can be found. There is no procedure, such as an 800 number or a website address, a cardholder can use to ascertain the issue date or fees that have been deducted from the card.[6]

The plaintiffs allege that after a period of time of non-use, known as the "dormancy period," the defendants deduct a $2.50 monthly "dormancy" fee, silently reducing the value of the card prior to the "Good Thru" date. Some gift cards are devoid of any disclosure of the dormancy fee on their face; others contain a non-bolded statement concerning the dormancy fee[7] in "minuscule font on the back corner" on the reverse side behind the raised-letter impressions from the front of the card, rendering the statement distorted and

---

[5] Am. Compl. ¶¶ 5i, 5ii, 5vi, 5vii, 5viii, 35i, 35vi, 35vii, 35viii, 39, 41.

[6] *Id.* ¶¶ 5v, 5vii, 5xiii, 35v, 35xiii, 36, 39, 42, 50-51 and Ex. A.

[7] The amended complaint does not provide the text of the statement concerning the dormancy fee.

unreadable. Because the dormancy fee is calculated from the card's date of issue, the plaintiffs contend that even if the cardholder knows the length of the dormancy period, without knowing or being able to ascertain the issue date, knowledge of the length of the dormancy period is useless. They also contend that deducting dormancy fees renders the "Good Thru" date and value amount displayed on the front of the card materially misleading, deceptive and confusing because the card will have either diminished or no value prior to the "Good Thru" date without the cardholder having made a single purchase.[8]

Additionally, the plaintiffs allege that the defendant banks' local branches advertising "free" and "no fee" gift cards is deceptive because the advertisements fail to disclose the imposition of dormancy fees.[9]

The defendants argue that the plaintiffs' state law claims are preempted by the NBA and the OCC regulations. They contend that the plaintiffs are attempting to impose a disclosure regime under Pennsylvania law that is inconsistent and in conflict with the federal scheme under the NBA.[10]

## The National Bank Act and Recent Supreme Court Law

National banks are authorized by the NBA, 12 U.S.C. § 1, *et seq.*, and are regulated

---

[8] Am. Compl. ¶¶ 2, 5xvi, 46-48, 58.

[9] *Id.* ¶¶ 5xi, 5xii, 35xi, 35xii, 44, 64-69. In addition to claiming that the defendants failed to disclose the deduction of dormancy and replacement card fees, the plaintiffs initially challenged the propriety of charging the dormancy and replacement card fees, alleging that the fees should never be imposed or are excessive. They have withdrawn these allegations. *See* Tr. at 4-5.

[10] *See* Tr. at 8-9. The defendants alternatively argue that the plaintiffs fail to adequately state their allegations that the defendants misrepresented their rationale for imposing dormancy and replacement card fees. *See* Defs.' Mot. to Dismiss (Doc. No. 8) at 24-25 (citing Am. Compl. ¶¶ 5xv and 5xvii). These allegations address the propriety of the fees charged, not the failure of the defendants to disclose that the fees would be charged. Because the plaintiffs have withdrawn their allegations challenging the defendants' right to charge the dormancy and replacement card fees, *see* Tr. at 4-5, this argument is moot.

4

by the OCC, §§ 24, 93(a) and 371(a). The NBA grants national banks the authority to exercise certain enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh. Congress has authorized the OCC to oversee the operations of national banks and to define these "incidental powers." *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n. 2 (1995); 12 U.S.C. § 93a.

To curtail intrusive state regulation of national banks, these "incidental powers" have been deemed "grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996). *See also Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12 (2007) ("when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way"). Nevertheless, states may regulate the activities of national banks so long as they do not prevent or significantly interfere with the exercise of the banks' authority. *Barnett Bank*, 517 U.S. at 33.

In its recent decision, *Cuomo v. Clearing House Ass'n, L.L.C.*, 129 S. Ct. 2710 (2009), the Supreme Court caused a sea change in the perception of the preemptive effect of the NBA and the OCC regulations. Before this pronouncement, courts appeared to be expanding the scope of federal preemption for national banks. *See, e.g.*, Adam J. Levitin, *Hydraulic Regulation: Regulating Credit Markets*, 26 Yale J. on Reg. 143, 157-58 (2009) (noting the strengthening trend in recent years of federal preemption of state laws regulating: late fees, various loan closing fees, disclosures in credit agreements, mortgage-broker subsidiaries of national banks, check-cashing fees, gift cards, tax refund anticipation loans, and credit card convenience checks); Rashmi Dyal-Chand, *From Status*

*to Contract: Evolving Paradigms for Regulating Consumer Credit*, 73 Tenn. L. Rev. 303, 320-21 and n.107 (2006) (noting how federal courts have limited the effectiveness of state consumer protection laws to protect credit-card borrowers by expanding the preemptive effect of § 85 of the National Bank Act). *Cuomo* reverses this trend and has dispelled the popular notion that all state laws that affect national banks in any way or to any degree are preempted.

In *Cuomo*,[11] the New York Attorney General sought information "in lieu of a subpoena" from national banks to determine whether they had violated New York's fair lending laws. The Second Circuit affirmed the district court's enjoining the attorney general from enforcing those state laws through demands for records or judicial proceedings. Those courts based their decisions on the OCC's regulation that had determined that the NBA prohibited states from enforcing compliance with their laws. 12 C.F.R. §7.4000.

The Supreme Court held that the OCC's regulation preempting states from prosecuting enforcement actions against national banks is not a reasonable interpretation of the NBA; and, accordingly, it is not entitled to *Chevron* deference.[12] *Cuomo*, 129 S. Ct. at 2715, 2721. In reaching its decision, the Court distinguished between a sovereign's visitorial powers and its enforcement power. It clarified that only visitorial powers are preempted, leaving the states free to enforce their laws so long as they are not contrary to and not preempted by federal law. *Id*. It cleared the way for state attorneys general to

---

[11] The action in the District Court had been initiated against Elliott Spitzer, the New York Attorney General at the time. Andrew Cuomo, who succeeded Spitzer in office, was substituted in the action.

[12] An administrative agency's reasonable interpretation of a statute that it administers is generally accorded deference and will not be disturbed by a court. See *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

6

file suit against national banks for violating state consumer protection laws.

Noting that "[n]o one denies that the National Bank Act leaves in place some state substantive laws affecting banks," the Court underscored that Congress has declined to exempt national banks from all state banking laws or state enforcement of those laws. *Id.* at 2717-18, 2720. The Court reaffirmed the holding of *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 660 (1924), that where a state statute of general applicability is not substantively preempted, the power of enforcement must rest with the state and not with the national government. *Cuomo*, 129 S. Ct. at 2717. The Court also emphasized that *Watters* was limited to the narrow question before it, that is, whether a national bank's subsidiary is entitled to the same immunity from state visitorial powers as its parent. It stated that *Watters* "is fully in accord with the well established distinction between supervision and law enforcement." *Id.* at 2717. Thus, against this backdrop, the Court concluded that the OCC's regulation went too far because it prohibits states from enforcing "valid, non-preempted laws against national banks." *Id.* at 2718.

**Federal Preemption Standard**

Federal preemption of a state law exists in three situations: express preemption, field preemption, and conflict preemption. *Holk v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009) (citing *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)). Express preemption occurs when a Congressional statute or agency regulation[13] has expressly stated that state law is preempted. *Cipollone v. Liggett Group,*

---

[13] Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have as much preemptive force as the federal statute. *Holk*, 575 F.3d at 339-40.

*Inc.*, 505 U.S. 504, 516 (1992). Field preemption applies when a federal statute or regulations promulgated under it are so pervasive that they completely occupy a field, leaving no room for additional state regulation. *Hillsborough County*, 471 U.S. at 713; *Holk*, 575 F.3d at 336. Conflict preemption arises when either compliance with both state and federal requirements is impossible or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Holk*, 575 F.3d at 339 (citations omitted).

In this case, the defendants contend that only conflict preemption is at issue. Nevertheless, we shall also consider whether express or field preemption requires that the action be dismissed.

**Express Preemption**

Express preemption is present if the NBA or an OCC regulation expressly prohibits the application of a state law to the marketing of or disclosures that accompany a national-bank issued gift card. When it enacted the NBA, Congress did not expressly preempt state laws in the banking business. Nor has the OCC issued regulations expressly stating its intention to trump state laws addressing gift cards.[14] Because neither Congress nor the OCC has expressly proclaimed that state laws concerning gift cards do not apply to national banks, there is no express preemption. Indeed, the defendants do not assert that express preemption applies.

---

[14] An example of an OCC regulation that expressly preempts state law is 12 C.F.R. § 34.4, which governs national banks' powers in real estate lending. Section 34.4(a) provides that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, . . . state law limitations concerning: licensing, registration, . . . by creditors; . . . loan-to-value ratios; the terms of credit; . . . escrow accounts; . . . disclosure and advertising; . . . rates of interest on loans. . ." are not applicable to national banks. § 34.4(a)(1),(3), (4), (9),(12).

8

### Field Preemption

Prior to *Cuomo*, the Supreme Court had recognized that neither the NBA nor the OCC's regulations promulgated under it completely occupy the field of banking so as to render every state law inapplicable to banks. For example, in *Watters*, it acknowledged that "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers. . . ." 550 U.S. at 12 (citations omitted).

Because national banks are subject to state laws that do not contradict national banking laws or impose an undue burden on the banks, state laws applied to national banks are not *ipso facto* preempted. *Id.* at 11. In addition, the existence of a particularly detailed federal regulatory scheme does not by itself imply field preemption of state laws. *Holk*, 575 F.3d at 339 (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990); *Hillsborough County, Fla.,* 471 U.S. at 717)). Similarly, the OCC has reiterated that state laws that "are not inconsistent with the powers of national banks" and "only incidentally affect the exercise of national bank powers" are not preempted. 12 C.F.R. § 7.4009(c)(2). Thus, neither the NBA nor the OCC's regulations are so pervasive that they completely occupy the banking field to the exclusion of all state laws.

### Conflict Preemption

Unlike the OCC regulation at issue in *Cuomo*, which was held to exceed the OCC's authority under the NBA, there is no contention that the OCC regulations implicated in this case exceed Congressional authority. Instead, the question is whether state law governing the marketing of gift cards or their disclosure requirements conflicts with the OCC's regulations authorizing national banks to issue gift cards or significantly interferes with the

national banks' gift card business.

The OCC has authorized national banks to issue and sell electronically stored value systems, such as gift cards. 12 C.F.R. § 7.5002(a)(3) (listing "offering electronic stored valued systems" as an example of a "permissible activity" that "a national bank may . . . provide or deliver through electronic means."). The OCC similarly authorizes banks to charge its customers "non-interest charges and fees." 12 C.F.R. § 7.4002(a). The amount of the fees the banks charge and the method of calculating them are considered "business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2).[15]

The OCC has offered guidance on appropriate disclosures of fees relating to gift cards. OCC Bulletin 2006-34, Gift Card Disclosures, 2006 WL 2384741 (Aug. 14, 2006) (the "Bulletin"); Stored Value Card Systems (Sept. 10, 1996). Specifically, in the Bulletin, the OCC advised national banks that it "expects national bank gift card issuers to take appropriate actions to ensure that critical information is provided in a form that is likely to be readily available to recipients, as well as purchasers, of gift cards." OCC Bulletin 2006-34 at 2. The specific disclosures that the "OCC would expect to see" on the face of the gift card include: the expiration date; the amount or existence of monthly dormancy and maintenance fees; and how cardholders can obtain additional information about their cards. *Id.* The Bulletin lists "other information that is important . . . [which] should be provided in a form that is designed to be passed on with the card to the recipient." *Id.* It further counsels that they "should take appropriate steps to avoid engaging in marketing or

---

[15] In establishing fees it charges, the bank considers factors such as the cost in providing the service, the deterrence of misuse by customers of the service and the enhancement of the bank's competitive position. 12 C.F.R. § 7.4002(b)(2)(i-iv).

promotional practices that could mislead a reasonable consumer about the terms, conditions, or limitations of the bank gift card product they are offering. *Id*. at 3.

The fact that the OCC's regulations have touched on the area of gift cards does not mean that any state law affecting a national bank's practice of issuing gift cards is preempted. Indeed, in its regulations, the OCC acknowledges the limited preemptive reach of the NBA. It proclaims that although "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its powers to conduct activities authorized under Federal law do not apply to national banks," state laws on subjects, including contracts and torts, that "are not inconsistent with the powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national bank powers" are applicable to national banks. 12 C.F.R. §§ 7.4009(b) and (c)(2).

The defendants contend that plaintiffs' state law claims are preempted by the NBA and OCC regulations because they conflict with the federal scheme under the NBA. They argue that requiring national banks to comply with Pennsylvania laws affecting gift card disclosures "significantly interferes" with the authorized banking activity of issuing gift cards. Realizing that national banks are subject to "generally applicable laws," they assert that the UTPCPL is not a "generally applicable law" because it is directed at the authorized activity of a national bank. Citing *Watters*, the defendants also argue that the state law claims are "contrary" to the NBA and OCC regulations because their enforcement would create a patchwork of regulatory schemes from different state laws. *Watters*, 550 U.S. at 14 ("Diverse and duplicative superintendence of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent."). Similarly, they argue that the plaintiffs' claims violate the OCC's preemption provision of § 7.5002(c), which states

that "[s]tate laws that stand as an obstacle to the ability of national banks to exercise uniformly their Federally authorized powers through electronic means or facilities, are not applicable to national banks."[16]

The defendants read the OCC's regulations authorizing national banks to issue gift cards too broadly. The OCC has promulgated regulations that authorize national banks to issue gift cards and to charge non-interest fees in relation to them. 12 C.F.R. §§ 7.5002(a)(3), 7.4002(a) and (b).[17] No other aspect of this banking activity is regulated. Nevertheless, ignoring this limited regulation, the defendants summarily conclude that because the OCC authorized national banks to issue electronic stored value systems, any state law seeking to regulate in this area is preempted. This sounds more like a field preemption argument, which the defendants concede they are not making,[18] rather than a conflict preemption one.

Although the Bulletin provides precatory guidance as to some specific disclosures in connection with gift cards, this guidance is nothing more than a policy statement that does not amount to a regulation. Agency action that lacks the fairness of the "formal, deliberative process" inherent in notice and comment rulemaking and agency adjudication, such as issuance of a policy statement, guidance or letter, does not have the force of law to preempt a state law. *Holk*, 575 F.3d at 339-40 ("[I]t is federal law which preempts

---

[16] *See* Defs.' Mem. at 14, 22 n. 8 (Doc. No. 8); Defs.' Reply Mem of Law at 3-5 (Doc. No. 17); Tr. at 8-11, 25, 27, 40.

[17] In addition, § 7.4002(b) provides the *method* by which banks must calculate the fees they charge. "[T]he method of calculating the [fees] are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2).

[18] *See* Tr. at 7.

contrary state law; nothing short of federal law can have that effect."). On that basis, the Third Circuit held that neither the FDA's issuance of a consumer advisory regarding the risks of mercury in fish nor its letter to the California state attorney general stating that his lawsuit brought on behalf of the state had a preemptive effect on the plaintiff's state law claims arising out of her consumption of mercury-tainted fish. *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237, 241-43 (3d Cir. 2008). *See also Bowler v. Hawke*, 320 F.3d 59, 60, 62 (1st Cir. 2003) (OCC's determination in informal opinion letter that the Gramm-Leach-Bliley Act of 1999 preempts three provisions of a Massachusetts consumer protection statute and corresponding regulations, considered "no more than informal agency guidance to banks and other interested parties" and, therefore, held not to carry force of law).

Because the OCC guidance on gift card disclosures does not impose any legal obligations upon national banks, it has no preemptive effect. Furthermore, the OCC's decision not to take the next step to give its guidance regulatory status evidences its intent that states are free to regulate the disclosure aspect of gift cards. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002).

The state law at issue is not directed at the authorized activity of a national bank. The UTPCPL does not target or regulate banks or the "business of banking." The statute prohibits fraudulent and deceptive conduct and practices in all consumer transactions. *See Gardner v. State Farm Fire and Cas. Co.*, 544 F.3d 553, 564 (3d Cir. 2008) (the purpose of the UTPCPL is to protect the public from fraud and unfair and deceptive business practices); *Burke v. Yingling*, 666 A.2d 288, 291 (Pa. Super. 1995) (same). It does not require banks to include specific content in their disclosures or disclose information in a

particular way. As applied to this case, the law focuses on disclosure of the terms and conditions of the banks' product. It does not affect the propriety of the terms and conditions. It does not mandate what the banks can or cannot do. It only requires that the banks disclose what they do to the consumer.

The duty to refrain from deceptive and misleading conduct is imposed on all businesses. State laws of general application, which merely require all businesses, including banks, to abide by contracts and refrain from making misrepresentations to customers, do not impair a bank's ability to exercise its gift-card issuing powers. At most, they "incidentally affect" the exercise of a bank's powers. *See, e.g., Jefferson v. Chase Home Finance*, No. C 06-6510, 2008 WL 1883484, at *12-14 (N.D. Cal. Apr. 29, 2008) (holding that application of general consumer protection laws against a national bank to bring claims that the bank misrepresented how it would apply prepayments was not preempted by the NBA or OCC regulations); *Poskin v. TD BankNorth, N.A.*, Civil Action No. 06-463, 2009 WL 2981963, at *20-*21 (W.D. Pa. Sept. 11, 2009) (adopting the reasoning of *Jefferson* and holding that a claim brought under the UTPCPL, a general consumer protection statute, that the defendant bank fraudulently misrepresented the plaintiff's employment history and earnings and approved an unauthorized amount of a loan, was not preempted); *Baldanzi v. WFC Holdings Corp.*, No. 07 Civ. 9551, 2008 WL 4924987, at * 2 (S.D.N.Y. Nov. 14, 2008) (stating that "[i]n contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted," and holding that claim that national bank violated general consumer protection statute when it charged interest accrued for one or more days

after principal balance on the loan had been paid was not preempted by the NBA or OCC regulations); *Young v. Wells Fargo & Co.*, __ F.R.D. __, 2009 WL 3450988, at *8-*10 (S.D. Iowa Oct. 27, 2009) (claims brought under state consumer protection statutes alleging that the national bank defrauded customers by using a computer system that was programmed to automatically charge as many property inspection fees as possible irrespective of their reasonableness held not preempted).[19] In sum, the defendants have not articulated, and we cannot discern, how enforcement of the UTPCPL would prevent or significantly interfere with their ability to engage in the banking activity of issuing gift cards.

Contrary to the defendants' contentions, the state law claims do not conflict with the NBA or OCC regulations. They do not impose duplicative or overlapping requirements on federal banks. There are no federal regulations controlling the marketing of gift cards or directing what disclosures a national bank must provide in connection with the issuance of a gift card.[20] Without OCC regulations prescribing gift card disclosures, there is no federal

---

[19] The cases on which the defendants rely are inapposite. In *Fultz v. World Savings and Loan Ass'n*, No. C08-0343RSL, 2008 WL 4131512, at *1 (W.D. Wash. Aug. 18, 2008), the plaintiffs brought state law claims for the defendants' conduct related to disclosures in mortgage lending. The OCC regulation at issue, 12 C.F.R. § 34.4(a), specifically preempted state laws, including any laws requiring specific statements purporting to impose requirements regarding disclosures in loan applications or credit-related documents. § 34.4(a)(9). Although the Washington Consumer Protection Act was a law of general applicability, the plaintiffs were trying to use it to require particular disclosures that the OCC had deemed off limits to national banks. *Id.* at *2. Because there is no OCC regulation governing gift card disclosures, *Fultz* is distinguishable and offers no guidance here.

*Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1037 (9th Cir. 2008) is also inapposite. There, the plaintiffs claimed that the bank failed to make adequate disclosures in connection with convenience checks. Although the plaintiffs brought their claims under a general consumer protection statute, the Ninth Circuit held that the claim was predicated on the violation of a specific California disclosure law that conflicted with an OCC regulation governing non-real estate lending powers. That regulation, 12 C.F.R. § 7.4008(d), contained a provision that expressly preempted specific state laws, including those requiring specific statements purporting to impose requirements regarding disclosures in credit-related documents. After quoting heavily from *Watters,* and conducting essentially no conflict preemption analysis, the court held that the specific state disclosure law was preempted by the OCC regulation. Thus, like *Fultz*, *Rose* is inapplicable.

[20] Indeed, the absence of such a mandate permits varied disclosures lacking uniformity. Therefore, there is no uniform federal regulatory scheme regulating gift card disclosures.

15

regulation that conflicts with state law. Thus, enforcement of the state law would not interfere with the NBA's purpose of creating a uniform federal regulatory system for national banks.

## Conclusion

Because enforcing Pennsylvania's consumer protection laws will not interfere with the defendant banks' operation or otherwise unduly burden or impair their ability to engage in the business of marketing and selling of gift cards, and there is no conflict with federal law, there is no basis for invoking federal preemption. Therefore, the motion to dismiss will be denied.